

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-1    NEMR ALI RAHAL,

D-2    RANIA M. FAWAZ RAHAL,
        a.k.a. Rania Mohamad Fawaz,

Defendants.

JUDGE : Tarnow, Arthur J.
DECK  : Det/AA Judge Crim Deck
DATE  : 05/18/2005 @ 15:53:31
CASE NUMBER : 2:05CR80476
INDI SEALED (KC) WI KC

18 U.S.C. § 371 – CONSPIRACY TO
        COMMIT FEDERAL CRIMES

18 U.S.C. § 1344 – BANK FRAUD

18 U.S.C. § 1029 – CREDIT FRAUD

18 U.S.C. § 2 – AIDING AND ABETTING

MAGISTRATE JUDGE MONA K. MAJZOUB

# *INDICTMENT*

THE GRAND JURY CHARGES:

## GENERAL ALLEGATIONS

At all times pertinent to this Indictment:

1.       **"Bust out" fraud** describes a scheme wherein a person intentionally ruins his own credit in an effort to obtain as much money as possible from his creditors, with no intention of repaying the debt.  One of the ways a person can maximize the amount of money he is able to obtain from his creditors is to "inflate" the available credit on his credit accounts by making bogus payments with worthless checks, or telephone payments on empty bank accounts, and then make purchases

or cash advances up to the inflated balance.  When the account holder can no longer obtain credit, he may leave the jurisdiction or file for bankruptcy to evade collection efforts.

2. **To "bust out" credit accounts:**

a. The subject obtains a number of bank and merchant credit cards.  He usually uses his true name and identity, to give the appearance of legitimacy to the credit accounts.  He may legitimately use some or all of the credit cards for a period of months or years; or he may acquire them very quickly, just prior to busting them out.

b. In a very short period of time, he makes a series of payments on one credit account using checks he knows are bogus, such as convenience checks from other credit accounts that will never be paid, or telephone payments using empty or closed bank accounts.  The worthless payments are credited to the account upon receipt, falsely inflating the credit limit on the account.

c. Before the credit company can determine the payments were bogus, the subject makes as many charges as he can, until the credit card stops being honored and the account has been "busted out."

   i. If the subject has a merchant credit card (for example, Home Depot), he may use the inflated available credit to purchase merchandise such as electronic equipment, expensive perfumes and jewelry, which is then resold.  Or, he may use the available credit to purchase merchant gift cards, which may be resold for cash.

   ii. If he has a VISA or MasterCard account, he may obtain cash advances at casinos and banks up to the fraudulently inflated available credit limit.

d. Eventually, the bogus checks are returned as "account closed" or "insufficient funds" checks.

e.          In order to evade collection efforts by the credit card companies, the subject may

declare bankruptcy or leave the jurisdiction.

3.          **J.P. Morgan Chase Manhattan Bank, MBNA America Bank, Citibank N.A., Bank**

**One, Discover Bank, Household Bank, Monogram Credit Card Bank of Georgia, Bank of**

**America,** and **Providian National Bank** are all financial institutions as defined by Title 18,

United States Code, Section 20, whose deposits are insured by the Federal Deposit Insurance

Corporation.

4.          **G. E. Capital** issues credit cards for major nationwide merchants such as Home Depot

and Best Buy, through its bank, Monogram Credit Card Bank of Georgia.

5.          **American Express** is a corporation headquartered in New York, New York and engaged

in business throughout the United States and internationally.  American Express extends credit to

persons, including corporations, who apply and qualify; those individuals are issued credit access

devices ("credit cards") and an account number.  American Express personal accounts do not

have a credit limit *per se*, but the account holder must pay the balance in full every month or risk

having the account shut down.

6.          **MasterCard** and **VISA** operate as licensing agencies that permit financial institutions

(such as banks and credit unions) to issue credit cards.  MasterCard and VISA act as

"switchboards" to facilitate credit transactions by their card holders at participating merchants.

For example, when a customer purchases merchandise with a VISA card, the retail merchant

enters the transaction at the store and the information is electronically transferred to VISA.

VISA forwards the information to the appropriate issuing bank.  The bank determines whether

the transaction should be honored and relays its decision to VISA.  VISA forwards the bank's

decision to the retail merchant, who completes or denies the sale.

7.      **"Access device"** includes any means of account access, such as a credit card, credit account number, bank account number, or personal identification number, that can be used to obtain money or other things of value, or that can be used to initiate a transfer of funds. **"Unauthorized access device"** includes any access device that is obtained with the intent to defraud.

8.      **NEMR ALI RAHAL** (D-1) and **RANIA M. FAWAZ RAHAL**, also known as Rania Mohamad Fawaz (D-2), are husband and wife, respectively.

9.      **NEMR RAHAL** was born in Lebanon.  He entered the United States in 1985 on a student visa.  He lived in McAllen, Texas, where he married a United States citizen in 1993.  In 1996, **NEMR RAHAL** applied for United States citizenship.

10.     In December 1998, **RANIA FAWAZ RAHAL** (D-2) came into the United States from Lebanon on a 6-month visitor's visa using the name **"Rania Mohamad Fawaz,"** and giving an address in Detroit as her residence while in the country.  On January 28, 1999, **"Rania Mohamad Fawaz"** gave birth to a son whom she named **Ali N. Rahal**.

11.     In March 1999, while he was living in McAllen, Texas, **NEMR RAHAL** became a naturalized United States citizen.

12.     In June 1999,  **RANIA FAWAZ RAHAL** moved to Weslaco, Texas.

13.     **NEMR RAHAL** divorced his American wife in August 1999.

14.     On November 2, 1999, **NEMR ALI RAHAL** married **RANIA M. FAWAZ RAHAL**.

15.     On November 15, 1999, **NEMR RAHAL** applied for lawful permanent resident status and a "green card" for **RANIA M. FAWAZ RAHAL**, his wife.

16.     On February 12, 2002, **RANIA M. FAWAZ RAHAL** became a lawful permanent resident, and she holds that status at this time.

17.        All **dates** in this indictment are alleged to be **"on or about"** the specific date stated.

18.        All allegations in this indictment occurred within the Eastern District of Michigan,

Southern Division, unless otherwise stated.

## COUNT 1
### (18 U.S.C. § 371 – CONSPIRACY
### TO COMMIT FEDERAL CRIMES)

D-1    NEMR ALI RAHAL
D-2    RANIA M. FAWAZ RAHAL, a.k.a. Rania Mohamad Fawaz

19.        The General Allegations are incorporated into this count by reference.

20.        Beginning in approximately 2000 and continuing through the present, the exact dates

being unknown to the grand jury, in the Eastern District of Michigan, Southern Division, and

elsewhere, defendants **NEMR ALI RAHAL**  (D-1) and **RANIA M. FAWAZ RAHAL**  (D-2)

did willfully and unlawfully combine, conspire and agree together, and with persons known and

unknown to the grand jury:

a.            to violate Title 18, United States Code, Section 1029, **Credit Fraud**, by using

unauthorized access devices ("credit cards") to obtain things of value aggregating over

$1,000 during a one-year period in a manner affecting interstate or foreign commerce;

and

b.            to violate Title 18, United States Code, Section 1344, **Bank Fraud**, by knowingly

executing and attempting to execute a scheme or artifice to obtain money, funds, or other

property owned by, or in the custody or control of, federally insured financial institutions

by means of false and fraudulent pretenses, representations or promises.


### OBJECTS OF THE CONSPIRACY

21.        The defendants conspired and agreed with each other, and with others known and

unknown, to bust out the credit accounts held in the name of **NEMR RAHAL** in order to obtain

**over $300,000** in cash and merchandise.  The defendants also submitted applications for

mortgages on two real properties in Dearborn, Michigan:  **NEMR RAHAL** applied for the

mortgage on 7515 Freda Street; and **RANIA FAWAZ RAHAL** applied for the mortgage on 5479 Argyle.  The mortgage applications for both properties contained false and fraudulent statements and representations.  Through these false applications, the defendants obtained an additional amount of money, **over $200,000**, from federally insured financial institutions.

## METHOD, MANNER, MEANS AND OVERT ACTS

22.       During the course of the conspiracy and to further their unlawful objectives, **NEMR ALI RAHAL**  (D-1), **RANIA M. FAWAZ RAHAL**  (D-2), and their unnamed co-conspirators committed the following overt acts, among many others:

23.       As early as 1991, **NEMR RAHAL** began opening credit accounts and bank accounts in his own name, using them and making regular payments on them.  By January 2003, **NEMR RAHAL** had established approximately 50 credit accounts.

24.       On his 1998 Federal Income Tax return, **NEMR RAHAL** of McAllen, Texas, filed as a single person.  He claimed gross income totaling **$9,032** derived from the operation of a wholesale clothing business.  On a MasterCard credit card application from Fleet Bank which **RAHAL** submitted on May 15, 1998, **RAHAL** listed his annual income as being **$75,000 to $85,000.**

25.       **NEMR RAHAL** filed his 1999 Federal Income Tax return as a single person living at P.O. Box 6816, McAllen, Texas.  **RAHAL** claimed gross income totaling **$31,849,** $31,506 of which was profit derived from the operation of a wholesale clothing business.

26.       On February 25, 2000, **NEMR RAHAL** applied to Chase Manhattan Bank for a mortgage on the real property at 7515 Freda Street in Dearborn, Michigan.  **NEMR RAHAL** listed his present home address as 6001 Coleman Street in Dearborn, Michigan, and falsely

claimed he had been residing at that address for the past 2.5 years.  **RAHAL** also falsely claimed

he was the manager of MSI Petro Mart, Inc., 26016 John R., Madison Heights, Michigan, and

that he had worked there for the past 4 years.  Included with this mortgage application were

copies of two fraudulent W-2 statements from MSI Petro Mart for the tax years 1998 and 1999.

The taxable wage amounts listed on these W-2s for **RAHAL** were **$34,462 for 1998**, and

**$34,935.77 for 1999.**  A gift letter was also included with this loan application indicating a

$5,000 gift had been given to **RAHAL** from his father, Ali Rahal, who was also represented as

residing at the same address of 6001 Coleman Street in Dearborn, Michigan.

27.        For the tax year 2000, **NEMR RAHAL** filed a joint return with his wife and co-

conspirator, who was listed on the return as **RANIA M. RAHAL**.  **NEMR RAHAL** claimed

gross income of **$9,660**; $12,000 of that was listed as "non-employee compensation" from work

done in Weslaco, Texas, and $660 as interest income.  **RAHAL** offset a  $3,000 capital loss

against this income, derived from the sale of approximately $200,000 worth of stock he acquired

during the year 2000.  **RAHAL**'s credit account records show he was regularly drawing very

large cash advances from his various credit accounts at the time he was acquiring this stock.

28.        For the tax year 2001, **NEMR RAHAL** filed a joint Federal Income Tax return with his

wife and co-conspirator, "**RANIA RAHAL**," where he claimed gross income of **$7,014**, of

which $6,930 was in the form of wages payable to **NEMR RAHAL** from the WL Minimart, Inc.

29.        **NEMR A RAHAL** and "**RANIA M. RAHAL**," 7515 Freda Street in Dearborn,

Michigan, filed a joint Federal Income Tax return for 2002.  They claimed gross income of

**$12,440**, including wages for **NEMR RAHAL** of $8,700 from the WL Minimart, and $2,520

from the Al Salam Supermarket.  In addition to **NEMR RAHAL**'s wages, "**RANIA RAHAL**"

claimed wages from the Al Salam Supermarket of $1,200.

a.      On a Shell Citibank credit card application "**RANIA FAWAZ**" submitted on August 28, 2002, **RANIA FAWAZ RAHAL** listed her gross annual income as **$49,000**. **RANIA FAWAZ RAHAL** also obtained an additional credit card on this account for **NEMR RAHAL.**

b.      On a Chase Manhattan Bank application for a Platinum MasterCard dated August 12, 2002, "**RANIA FAWAZ**" indicated she was employed at WL Minimart, and the household income for the year 2002 was **$99,000**.

30.     In January 2003, **NEMR RAHAL** fraudulently inflated the apparent available balances on his credit accounts by making bogus electronic "pay-by-phone" payments against several of his bank accounts.

a.      Immediately after the bogus payments had been made and before the banks and credit companies realized they had been defrauded, **NEMR RAHAL** obtained cash advances at casinos or banks and purchased merchant gift cards, up to the fraudulently inflated credit balances in the various accounts.

b.      Through this fraudulent conduct, **NEMR RAHAL** obtained **over $300,000** from credit issuing banks and merchants.

c.      **NEMR RAHAL** made no subsequent payments to his credit accounts after the "phone payments" were dishonored.  All of his credit accounts were eventually charged off as bad debt by his creditors.

31.     In the months preceding January 2003, just before **NEMR RAHAL** began busting out the credit accounts in his own name, **RANIA FAWAZ RAHAL** obtained numerous credit accounts in her maiden name, **RANIA M. FAWAZ.**

a.          Some of the accounts were opened using false and fraudulent information.  For

example, when **RANIA FAWAZ RAHAL** applied for a Platinum MasterCard through

Chase Manhattan Bank, she falsely stated that the household income was $99,000 a year

and that she was employed at WL Minimart; neither of those representations was true.

b.          When **RANIA FAWAZ RAHAL** obtained the credit accounts, she added **NEMR**

**RAHAL** to them as an "authorized user," and she had credit cards on her accounts issued

in his name as well as her own.

32.          For the tax year 2003, **NEMR RAHAL** filed a joint Federal Income Tax return with his

wife and co-conspirator, who was listed for the first time as "**RANIA FAWAZ.**"  Gross income

claimed on this return consisted of **$6,240** in wages for **NEMR RAHAL** from the Al Salam

market, and **$7,800** in wages for "**RANIA FAWAZ**" from the Al Salam market.

33.          Between January 2003 and the present, the following overt acts occurred related to

**NEMR RAHAL**'s credit accounts:

a.          **Bank of America VISA Account 4356 3100 0820 1373:**

    i.          On January 9, 2003, a $5,300 pay-by-phone payment was made from
Comerica Bank account 6817-06546-6.

    ii.          On January 10, 2003, a $3,500 pay-by-phone payment was made from
Comerica Bank account 6817-06546-6.

    iii.          Also on January 10, 2003, a cash advance of $4,512.99 was obtained from
the MGM Grand Casino in Detroit.

    iv.          On January 22, 2003, both of the pay-by-phone payments were
dishonored, leaving a **balance due and owing on the credit account of**
**$14,199.63.**  No payments of any kind were made to the account following this
activity, and the unpaid balance was charged off as bad debt by Bank of America.

b.      **Household Bank MasterCard 5437 0306 8352 0562:**

      i.        This account was opened under the name of "NEMR A AHAL" [sic].

      ii.       On January 9, 2003, a $4,900 pay-by-phone payment was made.

      iii.      On January 10, 2003, a $4,300 cash advance was obtained from Bank One on Woodward Avenue in Detroit.

      iv.      On January 13, 2003, a $402 cash advance was obtained from a Bank One branch in Dearborn, Michigan.

      v.       On January 16, 2003, the $4,900.00 pay-by-phone payment was returned NSF, bringing the past due balance to the account of $15,509.44.

      vi.      No further payments of any kind were made, and in September 2003 Household Bank charged off the account with a **past due balance owing of $18,198.87.**

c.      **MBNA VISA account 4313 0207 7800 7239:**

      i.        On January 4, 2003, a $9,292.49 pay-by-phone payment was made to the account from Comerica Bank account 6817-06546-6, the same account that was used to make the Household Bank payments denoted above.

      ii.       On January 5, 2003, a  $8,220 cash advance was obtained from the MGM Grand Casino in Detroit, Michigan.

      iii.      On January 8, 2003, the $9,292.49 payment was returned to MBNA as dishonored, leaving an unpaid balance on the account of $54,927.39.

      iv.      No further payments of any kind were ever made to this account and the **balance of $58,945.08 was charged off** by MBNA on June 30, 2003.

d.      **Chase Manhattan VISA account 4305 8703 6958 0519:**

      i.        On January 3, 2003, a $4,000 pay-by-phone payment was made to the account, drawn on Huntington National Bank account 2383-167480-0.

      ii.       On January 4, 2003, a $3,612.99 cash advance was obtained from the MGM Grand Casino in Detroit, Michigan.

      iii.      On January 14, 2003, the $4,000.00 payment was returned as dishonored, leaving a **balance owing on the account of $15,024.27.**

e.      **Chase Manhattan MasterCard account 5323 5034 9926 8425:**

      i.          On January 3, 2003, a $6,000 pay-by-phone payment was made to the account.

      ii.         On January 4, 2003, a $3,112.99 "Gamecash" cash advance was charged to the account.

      iii.       On January 14, 2004, the $6,000 payment was returned dishonored, leaving an **unpaid balance of $9,903.06.**  No further payments were made to the account.

f.      **Chase Manhattan MasterCard account 5369 9339 3905 8158:**

      i.          On January 3, 2003, a $3,400 pay-by-phone payment was made to the account.  Although this payment appeared to have been debited back to the account immediately, the subsequent returned payment fee was not charged to the account until January 9, 2003.

      ii.         On January 4, 2003, a $3,212.99 "Gamecash" cash advance was successfully charged to the account.

g.      **Chase Manhattan MasterCard account 5184 4500 6067 9341:**

      i.          On January 3, 2003, a $7,000 pay-by-phone payment was made.

      ii.         On January 4, 2003, a $6,267.75 "Gamecash" cash advance was charged to the account.

      iii.       On  January 14, 2003, the $7,000 payment was returned to the bank as dishonored.

h.      **Home Depot account CG7F91202132105:**

      i.          On November 12, 2002, this account had a balance owing of $35.05.

      ii.         On November 23, 2002, $2,450 in gift card purchases were made with this account.

      iii.       On January 16, 2003, a $2,100 payment was credited to the account.

      iv.       On January 17, 2003, $2,000 in additional gift card purchases were made to the account.

      v.        On January 30, 2003, the $2,100.00 payment was returned to Home Depot as unpaid.

vi.   The account was charged off as bad debt on July 31, 2003.

34.  **Comerica Bank account 6817-06546-6** is an individual account opened in **NEMR A RAHAL**'s own name.

 a.   The balance in the account on December 20, 2002 was $5.76.

 b.   On January 9, 2003, a check in the amount of $16,500 was deposited into the account. This check was drawn on a personal account of a person known to the grand jury.

 c.   On January 13, 2003, the $16,500 check was returned unpaid.

 d.   The account was closed on January 31, 2003.

35.  **Huntington National Bank account 2383-167480-0** was a joint account between **NEMR A RAHAL** and a person known to the grand jury.

 a.   The beginning account balance was $1,064.42 on December 7, 2002.

 b.   On January 3, 2003, a deposit of $23,100, consisting of three $7,700 checks drawn on the account of Dearborn Furniture Inc., was made to the account.

 c.   On January 6, 2003, a single check of $16,500 drawn on the Dearborn Furniture, Inc. account was deposited into the account.

 d.   On January 8, 2003, all three of the $7,700 checks deposited on January 3, 2003 were returned to the bank as unpaid.

 e.   On January 9, 2003, the $16,500 check deposited on January 6, 2003 was returned to the bank unpaid.

 f.   On January 31, 2003, the account was closed.

36.  On January 7, 2003, **NEMR ALI RAHAL** and **RANIA M. FAWAZ RAHAL** opened a joint bank account at Standard Federal Bank. From January 2003 through June 2004, approximately $4,000 was deposited into the account each month. Checks were then drawn on the account, roughly equal to the amount of deposits each month, to make payments to credit

accounts belonging to **RANIA M. FAWAZ**; no checks were applied to any of the past due credit accounts of **NEMR ALI RAHAL**.

37.       On April 1, 2004, **NEMR RAHAL** sold the property at 7515 Freda Street, Dearborn to Ihab Ali Kain, and obtained proceeds of $72,172.48 from the Amana Title Services account at Fifth Third Bank.

   a.          In the sale documents, **NEMR RAHAL** represented that he was then "a single person."

   b.          **NEMR RAHAL** endorsed the $72,172.48 proceeds check over to a third party in Texas.

38.       On April 15, 2004, **RANIA M. FAWAZ** applied for and obtained a **$134,400 mortgage** to purchase a residence at **5479 Argyle Street** in Dearborn, Michigan, in furtherance of the conspiracy.

   a.          April 8, 2004, **RANIA M. FAWAZ RAHAL** opened an individual account at **Bank One**, using the name "**Mrs. RANIA M. FAWAZ**." **RANIA M. FAWAZ** was the sole signature authority on the account.

   b.          The opening deposit was a $28,000 personal check from the third party in Texas who had received the $72,172.38 proceeds check from the sale of 7515 Freda Street.

   c.          On April 19, 2004,   **RANIA FAWAZ RAHAL** withdrew $16,735.24 from her account with personal check # 1005 payable to herself.  **RANIA FAWAZ RAHAL** subsequently obtained a $16,753.24 cashier's check, payable to herself, which she subsequently endorsed over to American Title Professional Inc.

   d.          In applying for the mortgage, **RANIA FAWAZ RAHAL** falsely claimed she was the General Manager at the Al Salam Supermarket located at 10394 West Warren Avenue

in Dearborn, Michigan; that she had worked there for the past three years; and that her

current monthly salary was $3,540 ($42,480 annually).  In fact, **RANIA FAWAZ**

**RAHAL** worked sporadically at the Al Salam Supermarket as a cashier, making $6.00 an

hour.

39.　　　　The offenses charged in Counts 2 through 11 were within the scope of the conspiracy and

were committed by the conspirators in furtherance of the conspiracy, as each conspirator could

reasonably foresee.  These offenses are alleged and incorporated into this count as overt acts.

40.　　　　All in violation of Title 18, United States Code, Section 371.


## COUNT 2
### (18 U.S.C. §§ 1344, 2 – BANK FRAUD, AIDING AND ABETTING)

D-1　　NEMR ALI RAHAL
D-2　　RANIA M. FAWAZ RAHAL, a.k.a. Rania Mohamad Fawaz

41.　　　　The General Allegations are incorporated into this count by reference.

42.　　　　Beginning in 2000 and continuing to the present, in the Eastern District of Michigan,

Southern Division and elsewhere, defendants **NEMR ALI RAHAL**  (D-1) and **RANIA M.**

**FAWAZ RAHAL**  (D-2) devised and executed, and aided and abetted each other and others

known and unknown to the grand jury in devising and executing, and attempting to execute, a

scheme to defraud and to obtain moneys or other property owned by, or in the custody or control

of, federally insured financial institutions by means of false and fraudulent pretenses,

representations or promises.

43.　　　　The defendants acted knowingly and with the intent to defraud.

44.　　　　In executing their scheme, defendants submitted mortgage loan applications that they

knew contained false and fraudulent representations of material facts, to induce federally insured

15

financial institutions to rely on the false representations and release money to them.  The defendants also obtained cash advances from financial institutions using their credit cards, with no intention of ever re-paying the cash advances.

45.     By their false and fraudulent pretenses, representations and promises, the defendants obtained in excess of **$500,000** of moneys belonging to, or in the custody or control of, J.P. Morgan Chase Manhattan Bank, MBNA America Bank, Citibank N.A., Bank One, Discover Bank, Household Bank, Monogram Credit Card Bank of Georgia, Bank of America, and Providian National Bank, all financial institutions whose deposits were then insured by the Federal Deposit Insurance Corporation.

46.     All in violation of Title 18, United States Code, Sections 1344 and 2.

**COUNTS 3 through 11**
(18 U.S.C. § 1029 – CREDIT FRAUD)

D-1     NEMR ALI RAHAL

47.     The General Allegations are incorporated into this count by reference.

48.     On or about the dates set forth below, in the Eastern District of Michigan, Southern Division, and elsewhere, **NEMR ALI RAHAL**  (D-1) used and trafficked in unauthorized access devices ("credit cards"), and by his conduct obtained things of value aggregating well over $1,000 during a one-year period.  The defendant acted knowingly and with the intent to defraud, and his fraudulent conduct affected interstate and foreign commerce.

49.     The defendant applied for, obtained, and / or used the listed credit cards while he was residing within the Detroit metropolitan area, in the Eastern District of Michigan, Southern Division.

50.        Each of the following constitutes a separate count of this indictment.

| Ct. | Defendant(s) | Credit Card Account | Issuing Bank or Agency | Date of Transaction | Amount of Transaction |
|---|---|---|---|---|---|
| 3. | D-1  NEMR RAHAL | VISA 4356 3100 0820 1373 | Bank of America | 1/10/03 | $4,512.99 cash advance, MGM Grand Casino |
| 4. | D-1  NEMR RAHAL | MasterCard 5437 0306 8352 0562 | Household Bank | 1/10/03 | $4,300 cash advance, Bank One |
| 5. | D-1  NEMR RAHAL | VISA 4313 0207 7800 7239 | MBNA | 1/5/03 | $8,220 cash advance, MGM Grand Casino |
| 6. | D-1  NEMR RAHAL | VISA 4305 8703 6958 0519 | Chase Manhattan | 1/4/03 | $3,612.99 cash advance, MGM Grand Casino |
| 7. | D-1  NEMR RAHAL | MasterCard 5323 5034 9926 8425 | Chase Manhattan | 1/4/03 | $3,112.99 "Gamecash" advance |
| 8. | D-1  NEMR RAHAL | MasterCard 5369 9339 3905 8158 | Chase Manhattan | 1/4/03 | $3,212.99 "Gamecash" advance |
| 9. | D-1  NEMR RAHAL | MasterCard 5184 4500 6067 9341 | Chase Manhattan | 1/4/03 | $6,267.75 "Gamecash" advance |
| 10. | D-1  NEMR RAHAL | Home Depot account CG7F91202132105 | Monogram Credit Card Bank of Georgia | 11/23/02 | $2,450 purchase of gift cards |
| 11. | D-1  NEMR RAHAL | Home Depot account CG7F91202132105 | Monogram Credit Card Bank of Georgia | 1/17/03 | $2,000 purchase of gift cards |

51.        All in violation of Title 18, United States Code, Sections 1029 and 2.


**FORFEITURE ALLEGATIONS**

52.        Upon conviction of one or more of the violations of Title 18, United States Code,

Sections 371, 1029, 1344 and 2 as set forth in Counts 1 through 11, defendants **NEMR ALI**

17

**RAHAL** (D-1) and **RANIA M. FAWAZ RAHAL**, also known as Rania Mohamad Fawaz (D-2), shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2), any property constituting or derived from proceeds the defendants obtained, directly or indirectly, as the result of such violations.

53.     Property subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a) includes, but is not limited to, the following:

a.      The **real property**, including all land, buildings, fixtures, improvements, and appurtenances commonly known as **5479 Argyle, Dearborn**, Wayne County, Michigan, more fully described as:

> Lot 672 and ½ of the vacated alley at the rear thereof, Ardross Subdivision No. 2, as recorded in Liber 39, Page 2, of Plats, Wayne County Records. 82-10-182-03-031

b.      **Cash/Currency:  $5,005.50** in U.S. Currency, seized on April 20, 2005.

54.     **Substitute Assets:**     If the property described above as being subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), as a result of any act or omission of the defendants:

i.      cannot be located upon the exercise of due diligence;

ii.     has been transferred or sold to, or deposited with, a third party;

iii.    has been placed beyond the jurisdiction of the Court;

iv.     has been substantially diminished in value; or

v.      has been commingled with other property that cannot be subdivided without difficulty;

each defendant shall forfeit substitute property, up to the value of the properties described above.

## MONEY JUDGMENT

55.         Upon conviction of one or more of the violations of Title 18, United States Code,

Sections 371, 1029, 1344 and 2 as set forth in Counts 1 through 11, defendants **NEMR ALI**

**RAHAL**  (D-1) and **RANIA M. FAWAZ RAHAL**, a.k.a. Rania Mohamad Fawaz  (D-2), shall

be ordered to pay a sum of money equal to **$500,000 in United States currency**, representing the

amount of proceeds obtained as a result of the offenses, for which the defendants are jointly and

severally liable.


THIS IS A TRUE BILL.

FOREPERSON


STEPHEN J. MURPHY
United States Attorney


ERIC STRAUS
Assistant United States Attorney


CYNTHIA OBERG
Assistant United States Attorney


RITA ELIZABETH FOLEY
Assistant United States Attorney


May 18, 2005

19

*MKay*

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number 05-80389 |
|---|---|---|

# 05-80476

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | Companion Case Number: |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** ARTHUR J. TARNOW |
| Yes    No ✓ | **AUSA's Initials:** _____ |

MAGISTRATE JUDGE MONA K. MAJZOUB

**Case Title:** USA v. NEMR ALI RAHAL, RANIA M. FAWAZ RAHAL

**County where offense occurred :** Wayne

**Check One:**    ✓ **Felony**    ☐ **Misdemeanor**    ☐ **Petty**

☐    Indictment_____/Information_____ **no** prior complaint.
✓    Indictment **✓**_____/Information_____ based upon prior complaint **05-80389**
☐    Indictment_____/Information_____ based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information:

**Superseding to Case No:** _____    **Judge:** _____

☐    Original case was terminated; no additional charges or defendants.
☐    Corrects errors; no additional charges or defendants.
☐    Involves, for plea purposes, different charges or adds counts.
☐    Embraces same subject matter but adds the additional defendants or charges below:

**Defendant name**    **Charges**


May 18, 2005
Date

CYNTHIA OBERG  (P 36338)
Assistant United States Attorney

(313)  226-9701
Phone Number

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/1/99